All right, our last argument then for the morning is docket number 24-1456, Soto v. Department of Veterans Affairs. Mr. Soto, I believe you reserved five minutes for your rebuttal, right? That is correct, sir. Okay, please begin whenever you're ready. Good morning, Your Honors. Amid the briefs today, I seek to briefly highlight this case repeats an analytical error corrected in Whitmore v. Department of Labor, where the board allowed the agency's removal narrative to eclipse the whistleblower context, misapplying the clear and convincing evidence standard. Before jumping into Carr, I note this is a 2302 B-9, 5 QRC 2302 B-9 issue involving assistance to others, which can encompass more than just signing grievances, which was the emphasis at motive 2 or Carr 2 determination. And please, I excuse my New York accent. Turning to Carr 1, the strength of the agency's evidence the board accepted. In terms of Carr 1, let me just put this way that the Carr 1 is not about the strength of the charges. And I'll just get to the nitty-gritty here. Whether the hostilities amid the protected activity contributed to the charges undermining the WPEA standard, that's important, especially amid inconsistencies shown in the record, it's in the briefs, and less protections for annuitants that such a review could be important. I'm not asking for extra protections for annuitants. I'm simply asking, well, why are charges being brought and the timing is very suspect after the duly noted email from the director after which all of the negative issues sort of flowed. And in essence, what we have here is an issue where, and I hate to put it in terms of abuse discretion, but anyone has discretion to bring charges. So why do these exist only after the duly noted email and after protected activity? And I think that's the emphasis of Carr 1 in terms of Whitmore trying to say that the strength of the charges don't really matter, it's whether the hostilities amid the protected activity contribute to the charges. Jumping to, and the one example, and please forgive me for jumping back and forth. I'm a lawyer. The issue of shifting, usually it's about shifting rationale. And we look at people that they shift from one rationale to the other. In this case, it's about shifting charges. After I testified at Congress, the agency contemporaneously noted the removal was for sick leave abuse. That fell apart two months later. They're constructing a whole Aspen issue and all the records that are contained in the evidence of record are dated after the removal. Just about the ones that the agency argue exist prior to the removal are unclear. And that's not the reason they brought up to Congress for the removal. They focused on the sick leave abuse and that kind of went away. Then of course, there's the deviation from the Aspen practice. We were allowed to go in front of a local supervisor who actually fixed most of these Aspen errors. Nobody's with the Aspen system. There's a lot of mistakes. It was allowed for 3.5 years. It was removed after protected activity. Jumping to call two. Management led the petitioner to assistance to others. A roadmap of perceived protected activity exists in some of the documents. They're actually showing the legalese shows that essentially the petitioner authored a lot of this activity. The issue with 2302B9 is what is assistance? Assistance, I would believe, is more than authoring a grievance or a signature on a grievance amid testimony that there was a lot of assistance in terms of many complaints. Any grievance can be verbal under 7103a9. A grievance under the statute is anything related to employment. Same thing with Whitmore demanded the nature and sensitivity of the disclosure and the potential embarrassment and disruption to be looked at. An error, interesting, the prior case was about CUE. An error that an employee challenges is usually challenged under a CUE standard. It doesn't just affect the individual employee. It affects the veteran. It affects money going out. It affects VA's quality review process at that regional office. So, it's more than just a single employee being affected. A group grievance involving roughly 200 to 300 employees was ignored. That's a major issue because all these 200, 300 employees were claims examiners. And request for information, what we call RFIs, has a statutory requirement that we have to identify purpose and how it's going to be used. I agree with some of what the AG put down in the board, but there's also an issue about, well, what if in justifying an RFI, you're into B8 and B9 territory, assisting others or disclosure of protected information. We have to identify the agency violated this law, and we intend to take action against the agency. So, that also expands the motive under CAR-2. And then jumping, I just want to say in terms of CAR-2, one grievance can establish motive and demanding enough motive is the incorrect standard in Burton. As to CAR-3, there's one piece of evidence that's not going to change. The separation was based on five to 10 comparators. The agency testified to this. The HR manager testified to this. Whitmore says CAR-3 weighs against the agency, that the agency couldn't support it. And then the board recasts that with some speculation, as I put in my briefs. Certainly, it's an interesting question because the testimony was that the action occurred because of five to 10 comparators. And lastly, on comparators, comparator framework is not just about annuitants. It's about how was the petitioner treated differently at work, such as was removing the aspirin review process at the local level contributed to by protected activity. And I'll end by saying that this case is about intermingling parts treated in isolation amid protected activity, impacting all the CAR factors. As in Whitmore, the board focused on the agency's misconduct narrative. And as Whitmore put it, dismissing evidence a reasonable fact find to make credit is not proper. Whitmore stated that when evidence is conflicting or vague, and there's conflicting evidence here noted in briefs, the agency loses. Respectfully, reversals in order or a remand for proper adjudication consistent with Whitmore and call. Thank you. Okay, great. Just one quick question, Mr. Soto. And that is that, as you know, at the federal circuit level, we are a court of review and we are bound to give deference to fact findings made by the board below. And so the challenge that you have as the appellant is to establish why it was so that the board was somehow unreasonable in its fact findings. And let's just take CAR factor one, for example. You know, the AHA concluded and the board upheld that there were multiple different issues that went to the basis for why the agency would have removed you. So I think that's the challenge that you have and we have as a court in order to overturn that. We're not reevaluating all of these fact questions in the first instance. We have to really believe that the AHA and the board were just really unreasonable in making the fact findings that they made. Understood. And that's exactly the issue with CAR one. Why were these issues? And some of them are dated. There were only three. And the sickly visual disappeared. And that was the one that Congress was told was the reason for the removal. Why charge something at the end? Some of these things lingered for a while. The other thing is that amid the hostility were some of these charges the result of the hostility amid the protected activity. That's also an issue that undermines clear and convincing evidence standard. So therefore, were these facts, and the facts are not challenged, but how they were considered against the clear and convincing evidence standard that the judges are supposed to, and the board rather, are supposed to consider, were they properly weighed in terms of, for example, well, why remove the Aspen matter? Why remove that protective feature when everybody gets it and the petitioner got it for three and a half years? So what's changed that now he's not due this due process as an annuitant when it was given to him for three and a half years, and he just happens to be after protected activity. And then it's the issue of the other two things were issues of time and attendance, which are explained. For example, one person, Ingram, for the May issue of the showing up to work or not properly showing up to work, Ingram was also affected. He didn't get notice, just like I did not. Well, he skates. And I put it in there. And the director actually admits, and I note the record that, yeah, mistakes were made, communications weren't made. And that's the reason why that mistake occurred, except for me. Then she makes an exception for me. And that's not what the facts show in the record. Just because the board did fact finding at the local level doesn't mean that the fact finding was not in error or contrary to the evidence of record. Sorry. Okay. Thank you. Unless there's any questions, you're into your rebuttal and we will save your remaining time and we'll now hear from the  I was wondering what Good morning, Your Honors, and may it please the court. In this case, the VA separated Mr. Soto, a reapplied annuitant, after a series of incidents raised legitimate concerns about his integrity and trustworthiness. Because substantial evidence supports the administrative judge's determination that the VA would have separated him even in the absence of his protected activity. This court should affirm the decision of the board. In this appeal, Mr. Soto asked the court to reweigh the evidence considered by the board in its car factor analysis and to revisit the administrative judge's credibility determinations. Neither of these requests is appropriate. On the contrary, the administrative judge's determinations are supported by substantial evidence as are the credibility determinations. Beginning with Let me just jump the car three. It does seem like there was comparator evidence in the record and that none of the comparators matched up perfectly because they all didn't do the same thing or they all didn't weren't retired annuitants and the like. But of all these various pieces, it looked like nobody was removed from their job for the offenses committed here. Why isn't that important under the car factor three? Well, because of the distinctions that Your Honor mentioned at the very beginning. But isn't that really rigid? I mean, that's a little problematic in terms of how you look at car factor three because you're just never going to have somebody that lines up on all fours as the same kind of legal position within the agency. And I mean, in terms of their employment authority and the exact same offenses and the like. Is that what we really meant or did we really mean? Let's look at other employees that have done similar things. Did they get the same action taken against them? Well, as Your Honor mentioned at the beginning of Your Honor's question, it's not just the conduct. It's also their status as a Chapter 75 employee is totally different. Sure, but I assume you're not arguing that re-employed annuitants have less whistleblower rights because they are at-will employees than Title V employees. They may not get the same kind of due process protections in terms of getting charges proffered against them and opportunity to respond and the like. But the agency still has to comply by the WPA and can't remove them if they're in ways that Title V employees wouldn't be removed. Absolutely, Your Honor. The relevant inquiry here under 1121 is would the agency have done this even absent the whistleblower, even absent the protected activity? And so certainly why would the agency keep somebody around who has a demonstrated track record of lack of trustworthiness when they don't need to engage in the sort of progressive discipline that the other Title V employees do? And so when we look at those other Title V employees, they can't be comparators in this case because of course the agency is going to go through the required protections of progressive discipline and not just separation right off the bat. Because they have to under the Douglas factors and various things. Absolutely, that's right, Your Honor. And then of course the second— The Douglas factors have no bearing in a whistleblower case? Not when the appellant is a retired annuitant because they don't have—typically the MSPB cases that this court hears are they haven't proved the charges or the penalties excessive, etc. Here that's that all of those protections aren't at play because Mr. Soto is a retired annuitant. Did the agency rely on the distinction between retired annuitants at will and the others? Or is that your argument? In what aspect of this case? In terms of deciding when the agency said we can't find any comparators. So what I know is that there was discovery. So Mr. Soto is not represented here but he was represented below and that there was discovery requested for comparators and that the agency wasn't able to locate any. The initial decision by the AJ, the evidence from the agency was oh we don't treat people differently. It was very vague as I recall. And there was a remand from the board, full board, saying go back and look at that again. Right. Well the remand was most focused on CAR factor 2 but there was some issue in CAR factor 3 to revisit and in revisiting that there was no evidence of— My question is I saw in your brief that you used the distinction between the retired annuitant and the Chapter 75 employees as a basis for finding non-comparators but I couldn't see where the board, the AJ or the board actually used that factor. I believe if we flip to page 28 of the second initial decision we can look at the specific language that the board used. 28 of the second. This is appendix page 27 and 28. And the AJ states— Is it in the actual appendix? Yes, Your Honor. The appendix is messed up. 27, 28? Yes, Your Honor. Pages 27 and 28. And just for some context, this is the board's second initial decision after remand. 27, 28? Yes, Your Honor. We don't have 27, 28. I'd be happy to share my copy with you, Your Honor. Oh, there's two volumes. Pardon me? There's two volumes. Oh, two. Yeah, I'm sorry. Volume 1 or Volume 2? This is Volume 1, Your Honor. Volume 1. 827, right? 27. 827, yes, Your Honor. 827. And well, that's where the— 827, fine. Thank you. And so— Are you talking about footnote 10? Yes, Your Honor. That's on the following page. I was going to tee it up with the— 27 to 28. I thought you were talking about 27, 28. My apologies. My apologies. Even without the New York accent that Mr. Soto has, sometimes hard to understand. So the first paragraph of Section 3, which is on page 27, tees up. But as Judge Hughes draws our attention to, footnote 10 is on the following page. And the AHA states that— We're now on page 28? That's right, Your Honor. Footnote 10. And the AHA references non-whistleblowing re-employed annuitants that the agency did not terminate for the following reasons. And so that footnote, if Your Honor wants to take a moment to review, suggests that the agency did not locate those employees. Mr. Soto mentioned there were 5 to 10 comparators initially? I'm not sure what Mr. Soto is referring to. I believe it may have be either other folks that had made errors with Aspen, or potentially, I know there was another co-worker who had not come off of his compressed work schedule when there was this training. This one that was transferred to California? That was, I believe that was the agency, the individual that the agency brought up in the first initial decision. I thought he identified one that went to California, and the board and the agency dismissed him as a comparator because his reason for his problem was job performance-related as opposed to misconduct going to honesty and character. That's right, Your Honor. I appreciate you refreshing my memory. Now that you've said that. I think that was his witness. That's right, Your Honor. I think that's correct. I think that's the only witness he identified. Right. But again, I don't think that they're the types of trustworthy issues that were at play here. I mean, this is an individual, it's important to put this in context. There's the first EEO training where, okay, he doesn't go to the fifth day, even though permission was requested and granted for that day. He doesn't come off compressed work schedule. And the director, mind you, this is the director of an 800-person regional office. This is not just the direct supervisor that's down the hall. This is somebody, you know, SES-level authority figure. And she tells Mr. Soto, next time there's a training, you come off of your compressed work schedule. Two weeks later, there's an AFG training, and Mr. Soto doesn't come off his lack of trustworthiness, lack of integrity that isn't present with any of the other comparators that are discussed. And certainly, no other comparator that's a re-employed annuitant. And so under CAR Factor 1, the motives were, or the evidence was quite strong, as the AJ found, to separate Mr. Soto. Again, this is a re-employed annuitant. With regard to CAR 1, I think Mr. Soto is arguing that while the ASPEN matter was being considered, he asked for access to his actual ASPEN file. I don't recall that aspect of his argument, Your Honor. My understanding of Mr. Soto's argument on the ASPEN issue is that rather than evidence of an intentional act of dishonesty in trying to claim more credit generally than due, he said it was a mistake, some error. That's right. And that the ASPEN system itself, the computer system, is prone to glitches, that you can hit the wrong key, you can get a duplicate. And there was testimony to that effect in the record. That's right, Your Honor. And the AJ did not credit the testimony that this was an inadvertent mistake. And I think he didn't credit his testimony, but his testimony is in distinction from the other testimony that these glitches can be accidental. And then my point was, I thought he said that he asked for access to his file so he could review what happened and be able to better explain why it was a mistake and not an actual intentional act. I don't recall that request being made. He very well could have made that request. But I think— If the request had been made and not granted, would there be a reason why? I don't know, Your Honor. I don't recall, so I can't speak to that. What I do know is that there was testimony that ASPEN entries, there are errors occasionally. But in this case, there were five duplicates for one case. And the AJ stated that it's just—it's not—there's no feasible reason why there'd be five duplicates for a single case in ASPEN. And he didn't credit the credibility of Mr. Soto saying that that was an inadvertent mistake. Again, those types of credibility determinations are— Was the AJ clear that this was a credibility call? I believe—I know there's three or four instances where the AJ flat out says that testimony is being fabricated. I don't believe he used such strong language in the ASPEN issue. But my memory is that the AJ did not credit Mr. Soto's testimony that the ASPEN issue was the result of an inadvertent mistake. And so what we have is these three incidences that create serious concerns over Mr. Soto's— Mr. Soto said something today about ASPEN protections. Do you know what he's referring to? No, Your Honor. I'm not sure what that was a reference to. What about his argument that there were shifting rationales for terminating him? Originally, it was about abuse of sick leave. And then in a late-breaking way, the agency had to shift rationales. Right. So a couple of things, Your Honor. First, as a re-employed annuitant, the agency is not required to share the—to explain the grounds of separation. And so what happened is that originally the agency said, you know, your services are no longer required. Thank you. You're separated. And then there was—after his termination, there was some congressional inquiry and the agency raised this issue about sick leave. Subsequently, the Director Witte authored a memo delineating all of the reasons why Mr. Soto was separated, namely these integrity concerns. And so Mr. Soto's argument about shifting rationale, number one, this issue was waived because it wasn't raised in his petition for review. And mind you, he was—he had very competent counsel below. Did you just admit that what they told Congress was made up and they came up with better reasons? Well, there seemed to be—and Director Witte had testimony to this effect—that once there was this congressional inquiry, which is after he was terminated, so of course it wasn't, you know, reprisal for his congressional testimony. Once there was a congressional testimony, there were all these inquiries coming from Congress, and that it really kind of left her—it went out of her hands, went up to OGC. And, you know, OGC was not the decision maker in this case. Of course, she was the decision maker, and she wrote the memo saying, these are the reasons why I terminated her. Well, was it really a shifting ground at all? I mean, wasn't the agency first saying, look, we don't have to give you a reason. The law doesn't require it. Right, and then— And then there was a complaint, and the agency then backs off and says, now I hear you talking. Maybe there's a whistleblowing issue here. Maybe something's going on. You really don't know why we did it? Right. Right, Your Honor. I think the one missing piece is there is this white paper in between those two rationales that was provided to Congress from the VA OGC, and that's where this issue of sick leave is brought up. That's not at issue in this case. The agency is not presenting that as a reason for his termination. His termination was for his clear pattern of lack of trustworthiness going against the direction— She was the one that made the decision to terminate his at-will employment, and then later when it was clear that there was going to be a whistleblower case, so the agency had to justify its actions, she wrote a memo that explained her rationale. Yes, Your Honor. One caveat is that Bonnie Wax, the HR director, also advised Director Witte in that determination, but this is not to say that her reason contemporaneously wasn't the integrity—her reasons contemporaneously were those integrity issues, but she didn't document those until September, three or four months after separation. Because more than substantial evidence supports the administrative judge's robust, fulsome decision in this case, we'd ask that this court affirm the decision of the board below. Okay. Thank you very much. Thank you. Five minutes. Welcome back, Mr. Soto. You have five minutes of rebuttal. Thank you, Your Honor. Briefly, the agency argument treats this as a straightforward misconduct case. I think that's pretty evident. Despite saying that this is not about re-arguing the facts, well, my colleague just re-argued the facts or presented them in a different manner. First of all, I just want to correct a few things. One, I did request access to the Aspen records. I maintained my own Aspen sheet separate. I was denied access. That's in the record, in the testimony at the board. Second of all, his— Can I just interrupt, please? So you had a copy of your Aspen sheets? On government computers because it has what we call PII, so I couldn't take it home. Yes, I asked for a copy of just that, but they wouldn't give it. That could have— Did you have access? No. They removed me. They removed all my access. Sorry, sir. If I may continue, my colleague is incorrect on comparators. The issue of the EEO leave and whether it was complete, comparators were Ramirez. He had done training where they didn't require him to change the schedule. The comparator for the issue in May was Ingram. He was caught in the same situation I was. He didn't receive notice, but he wasn't labeled as an integrity risk. The comparators I was noting, interesting enough, my colleague doesn't note that. And please, indulge me for a second. I just want to make sure I have the citation. And this is in the initial decision. The AJ relies on the comparators. His initial decision is because of the comparators. And then when the board remands, he recast the matter. HR, and unfortunately, I'm trying to find the exhibit. It's noted in my brief, but the HR manager testifies. As a matter of fact, it's noted in the initial decision. And it's also noted in my reply to the agency informal brief, where it's all underlined and indexed in. It's the testimony of the HR manager. They relied on five to 10 comparators to take the action against the petitioner. That is in the record. That's not going to change where those comparators came from. I am not sure, other than Mrs. Wax, the HR manager, that came from her. And that it doesn't matter how many times the board reissues. Whitmore says, well, there's five comparators that the agency testified to under oath were relied on. So what's changed now? Those five comparators, not considering those by the board is arbitrary and capricious. And it's not, doesn't fit within the CCE, the Clear and Convincing Evidence record. Other, and forgive me here, I'm just trying to respond to the agency. In terms of the aspirin protection that your honors noted, I just want to mention, since I've been there four years, there was this process where you sit down with and Mrs. Edwards testified to this. It's in the briefs. They review your aspirin record before it becomes official. Everybody makes mistakes on this. It's always corrected. It doesn't matter. I mean, there are all sorts of mistakes on the system. But between the local supervisor and the employee, they correct the record for proper credit. Why remove that process in the middle of the hostility amid the protective activity? And that's the question that I think challenges the finding of Clear and Convincing Evidence in this matter. Because in essence, a process that's always been there is all of a sudden gone. And the only reason for that is to essentially construct a narrative that cannot be challenged. Same thing with the issue of the sick leave at Congress. I mean, I don't want to call it false testimony, but they told Congress one thing. And then they, after Congress went away, they changed the narrative when litigation was coming up where they would have to put something solid in front of a court, such as MSPB or this court. And in that respect, it's not about reweighing the evidence, but it's whether Clear and Convincing Evidence was properly followed. The agency doesn't get to remake the facts their way. The record shows records on aspirin that are just dated past the removal and don't have my name on it. I'm not sure how that's evidence or relative evidence. The statutes we've called three, similarly situated, it's not just about position, as your honors stated. I believe similarly situated. And I think the judge noted Ricky in his position, and I hope I got that right, but that involved a comparison of position descriptions. I'm a rater, the same as two, 400 other claims examiners. If that process is available to claims examiners, why not the petitioner? And same thing, Title V annuitant Douglas factors, well, I think it helps to review Call 1 against Douglas factors, because how else do you determine if the action is against the Clear and Convincing Evidence that the action would have occurred anyway? And I end with that. Thank you. Okay. Thank you very much, Mr. Soto. Much appreciated. The case is now submitted, and that concludes today's arguments.